443 F.2d 745
 CONTINENTAL AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Frontier Airlines, Inc., Delta Air Lines, Inc., Intervenors.
CONTINENTAL AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Delta Air Lines, Inc., National Airlines, Inc., Eastern Air Lines, Inc., Intervenors.
 No. 23560.
 No. 23561.
 United States Court of Appeals, District of Columbia Circuit.
 Argued June 16, 1970.
 Decided February 12, 1971.
 
 Mr. Thomas D. Finney, Jr., Washington, D. C., with whom Mr. Lee M. Hydeman, Washington, D. C., was on the brief, for petitioner.
 Mr. Warren L. Sharfman, Associate General Counsel Litigation and Research, Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, General Counsel at the time the brief was filed, O. D. Ozment, Associate General Counsel, J. Michael Roach, Atty., Civil Aeronautics Board, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondent. Mr. R. Tenney Johnson, General Counsel, Civil Aeronautics Board, also entered an appearance for respondent.
 
 
 1
 Mr. Louis Hayner Kurrelmeyer, New York City, with whom Messrs. R. S. Maurer, James W. Callison, Atlanta, Ga. and Robert Reed Gray were on the brief, for intervenor Delta Air Lines, Inc., in case No. 23,560.
 
 
 2
 Messrs. Richard A. Fitzgerald and Robert J. Corber, Washington, D. C., were on the brief for intervenor, Frontier Airlines, Inc., in case No. 23,560.
 
 
 3
 Mr. Robert Reed Gray, Washington, D. C., with whom Messrs. R. S. Maurer, James W. Callison, Atlanta, Ga., and Louis Hayner Kurrelmeyer, New York City, were on the brief, for intervenor, Delta Air Lines, Inc., in case No. 23,561.
 
 
 4
 Mr. Andrew T. A. MacDonald, Washington, D. C., entered an appearance for intervenor National Airlines, Inc., in case No. 23,561.
 
 
 5
 Messrs. George C. Neal and Brian C. Elmer, Washington, D. C., entered appearances for intervenor Eastern Air Lines, Inc., in case No. 23,561.
 
 
 6
 Before McGOWAN and ROBINSON, Circuit Judges, and MATTHEWS*, Senior District Judge.
 
 McGOWAN, Circuit Judge:
 
 7
 Continental Air Lines, Inc., presents two petitions seeking review of orders of the Civil Aeronautics Board making route awards. In No. 23,560, it complains of a grant of certificate authority to Delta Air Lines, Inc., between Dallas/Fort Worth and Phoenix. In No. 23,561, it challenges an award to the same carrier of a route between Houston and Miami. The orders under attack issued from two proceedings instituted by the Board under Section 401 of the Federal Aviation Act of 1958 (49 U.S.C. § 1371). Due to the interrelationship between these two proceedings, and the fact that Continental's allegations stem in large part from this connection, we heard these appeals at the same time and now find it suitable to dispose of them in one opinion.
 
 
 8
 * In 1961 the Board made an extensive, area-wide investigation of the existing long-haul airline service in the Southern portion of the United States, carefully analyzing the service currently being provided to more than twenty-two cities ranging from Florida to California. Southern Trans-continental Service Case, 33 C.A.B. 701 (1961). The Board's awards in this case included two transcontinental routes to Delta (Atlanta to Los Angeles, and Atlanta to San Francisco) and one transcontinental route to National Airlines (Miami to Los Angeles). Continental received no transcontinental route, but was permitted to serve the Houston-Los Angeles segment. The Board, in granting the awards, made two major policy decisions. First, in order to provide service to the broadest spectrum of passengers, no restrictions were to be placed on intermediary stops on the route segments granted.[1] Second, no competition was to be permitted on these routes, because the carriers were "just emerging into the jet age with the financial and equipment problems attendant thereto."
 
 
 9
 By 1967 the Board was aware of changing conditions which made reexamination of its earlier awards necessary. In the intervening years, there had been a striking increase in the number of passengers traveling the various routes in this part of the country; and the carriers serving these routes had reached a high degree of financial stability. There were large numbers of passengers and potential passengers asking for improved and more direct service between important cities in the area in the form of nonstop and turnaround flights — a demand which tended to be frustrated by the monopoly nature of the earlier awards.
 
 
 10
 Thus the Board predicated its new look at the situation on the principle that competition on the established routes, rather than the creation of new routes, was needed. In this manner, it was hoped that better service between the principal city-pairs in the South would result. Therefore, rather than institute a general area-wide study of the kind used in 1961, the Board wanted to focus attention on existing service in particularized markets. Accordingly, it initiated four separate proceedings before four separate hearing examiners. The principal issues to be decided in each of these proceedings were (1) whether there was a need for competitive service in the relevant markets, and (2) which carrier should be selected to provide any needed competitive service. Two of these proceedings are the respective sources of the orders presently under attack, namely, the Southern Tier Competitive Nonstop Investigation, which included Houston-Miami along with seventeen other city-pairs, and the Dallas/Fort Worth-Phoenix Nonstop Investigation, which involved only the Dallas-Phoenix market.[2]
 
 
 11
 In each appeal before us, petitioner Continental urges that the Board utilized its selection criteria inconsistently in these proceedings, especially as between the Dallas-Phoenix and the Houston-Miami awards; and that, in No. 23,560, a consequence of this is that the Board's order is lacking in the reasoned conclusions, founded upon requisite findings, contemplated by the applicable statutes. In No. 23,561, these lines of attack are supplemented by a further claim that the Board's order lacks the support of substantial evidence in the record.[3]
 
 
 12
 A. The Dallas-Phoenix Case (No. 23,560).
 
 
 13
 The Board, in its order initiating this proceeding, emphasized its acute concern for the service being provided by American Airlines to passengers in the local Dallas-Phoenix market, due to American's practice of serving the route only as a small segment of its longer route. As a result of this concern, the Board imposed the following prehearing restrictions: "(1) that any authority granted in this proceeding shall be in the form of a separate segment; and (2) that single-plane service beyond Dallas/Fort Worth shall not be permitted."[4] However, at the time the Board consolidated the applications for hearing, Delta asked the Board to delete the restriction against single-plane traffic east of Dallas/Fort Worth. The Board granted this request because it thought the restriction "would unduly and prematurely limit the possibilities for new and improved single-plane service in a market where connecting passengers outnumbered local passengers in this market, and * * * the bulk of these connecting passengers make their connections at Dallas for points east." This, said the Board, would allow "applicants with existing routes east of Dallas to propose single-plane services in many of these markets and to argue these `beyond area' service benefits and traffic support in aid of their proposals in the principal market at issue * * *."
 
 
 14
 Ten carriers, including Continental and Delta, applied for the route. In its showing at the hearing, Continental pointed out that it had served both Dallas and Phoenix since 1961, but that operating restrictions had prevented it from providing service between the two points. It proposed two daily, nonstop, turnaround flights, with early morning and late afternoon departures in each direction.[5] In addition to offering various promotional fares, Continental said that, if the route were awarded, it would offer an economy rate of $46.00, available for a limited number of seats.
 
 
 15
 Delta related that, although it had no identity[6] at the Phoenix airport, it was already serving Dallas on its Atlanta-Los Angeles transcontinental route. It proposed the operation of five daily nonstop jet flights in each direction.[7] All of these would be segments of longer routes, and each would serve three or more cities east of Dallas/Fort Worth. There would be morning flights in each direction as well as midday service. Two flights in each direction were to operate at off-peak night hours, and were "designed particularly for the carriage of mail and cargo" and to "meet the demands for night coach service with attendant lower fares."
 
 
 16
 The fare suggested by Delta for these night coach, off-peak runs was $48.00. The daily total of seats available at this fare was said to be 130, as compared to Continental's daily total of 30 seats on its $46.00 economy fare. Moreover, Delta stressed its ability to provide first single-carrier[8] and first single-plane service to 93,000 passengers moving to points on its system east of Dallas, particularly in the southeastern portion of the country. Both Delta and Continental foresaw profitable operations based on their proposals.
 
 
 17
 The Examiner's initial decision concluded that there was a need for new competition in this market, finding that (1) the market was experiencing tremendous growth, and (2) American's service was inadequate:
 
 
 18
 The shortcomings of American's service pattern results [sic] not so much from the absence of local turn-around service, or from any other single outstanding deficiency, but rather from the failure of the carrier generally to provide the quality and quantity of service essential to keep pace with the heavy traffic increases in the market. For example, the passenger movement between 1962 and 1966 practically doubled with no change whatsoever in the quantity of nonstop service offered. There is a complete absence in the record of any promotional activities on the part of American — past, present, or future — which would tend to show that the traffic potential between these cities was actively being exploited to the greatest extent possible.
 
 
 19
 The Examiner then selected Delta as American's competitor in this market. He explained that Delta far surpassed the other applicants in terms of frequency, timing, seating capacity, fares, and beyond-segment benefits. With regard to Continental's application, he stated that the single factor in favor of Continental was its turnaround service. However, the Examiner found that, because Continental was restricted from making beyond-segment flights in this market, it did not have the needed back-up traffic which would permit it to provide both the service requirements of the market and the needed "competitive spur" to American.
 
 
 20
 After the Examiner's decision had been rendered, Continental and other unsuccessful applicants petitioned the Board to review it. The Board granted this request and invited briefing and oral argument. Thereafter, on July 24, 1969, the Board entered its opinion and order in this matter, as well as in the other three proceedings which were being conducted simultaneously.
 
 
 21
 The Board, affirming the Examiner's selection of Delta, emphasized the benefits of Delta's proposed frequency and schedule. It also expressed its pleasure with Delta's apparent ability to achieve a delicate balance by providing enough back-up traffic from beyond areas to keep schedule frequencies high and enough capacity to insure seats for local passengers between Dallas and Phoenix. The Board found as a fact that 60% of the Dallas-Phoenix traffic was made up of connecting passengers, as distinguished from local travellers between the two points. It considered improved service for them to be a factor highly relevant to the public interest, and it concluded that this could be done by Delta without scanting local service because, after deducting the needs of the connecting passengers, Delta still would have more seats available to local traffic than any other applicant. It noted that Delta's more frequent schedules met a particularly critical need for westbound service in the mornings, and that Delta was alone in offering late evening service in both directions.
 
 The Board said of Continental:
 
 22
 Turnaround service, such as that proposed by some carriers in this proceeding, may be advantageous in some markets which require schedules tailored to the peak traffic needs of the local passengers, with all available seats for local traffic and less possibility of delay as a result of operations of the local segment being part of a through pattern. However, these do not appear to be the principal problems in this market.
 
 
 23
 The Board compared in these terms the proposals of Continental and Delta with respect to support traffic and quantity of service proposed:
 
 
 24
 "Continental, for example, forecasts no on-line support traffic and proposes two daily round trips. Most applicants propose three round-trip flights based on beyond-segment forecasts of between 10,000 and 42,000 passengers. Delta, however, proposes five daily round trips over the segment and states that its ability to provide this volume of service derives from its access to over 90,000 single-plane and single-carrier passengers, including first single-plane passengers in eleven east-of-Dallas points."
 
 
 25
 Continental and other disappointed parties (including Eastern Airlines, whom the Board had regarded as Delta's principal competitor on the showing made) petitioned the Board for reconsideration of its decision. Continental urged, inter alia, that the Board had applied carrier selection criteria inconsistently in the Dallas-Phoenix case and in the Houston-Miami phase of the Southern Tier Investigation. The Board denied reconsideration without discussing the contentions raised by Continental.
 
 
 26
 B. The Houston-Miami Case (No. 23,561).
 
 
 27
 Continental, although seeking to serve a large number of the markets in issue by both separate and combination proposals, submitted a specific proposal restricted to the Houston-Miami route which stressed its identification with Houston by reason of its existing routes from Houston to the west and northwest, and its historic interest in the traffic moving over the route in question. It proposed five nonstop trips daily between Houston and Miami;[9] and it emphasized, among other things, the benefits to the beyond-segment traffic, the attractive timing of its flights, the economy of its fares, the special comfort features of its equipment, and its promotional capabilities. Finally, Continental introduced evidence suggesting the need of acquiring this route for its own financial well-being, and asserting the close relationship of this market to the orderly development of its system.
 
 
 28
 Delta, on the other hand, offered no plan confined to the Houston-Miami segment. Instead, it proposed to serve this market only as part of a broader proposal that would involve transcontinental flights from Miami to Los Angeles and Miami to San Francisco, with stops at Houston. The only evidence Delta offered with regard to the Houston-Miami segment was that serving these cities would allow it operational flexibility in terms of repositioning aircraft at both ends of the segment. Furthermore, there was no showing that this segment alone would be profitable to Delta.
 
 
 29
 The Examiner summarized the needs of the Houston-Miami market in the following manner:
 
 
 30
 This is one of National's monopoly markets. * * *
 
 
 31
 Load factors have not been high but the market has not been developed aggressively. No nonstop service was provided between June 1962 and mid-1966, when a daily roundtrip was inaugurated. A study of nonstop flights per 100 passengers as of September 1967 on Houston's 15 markets shows Miami service the third poorest, with 1.2 flights per 100 passengers.
 
 
 32
 He found that the addition of a competitor to the route would "accelerate the development of the market," and "is indicated as a requirement of the public interest."
 
 
 33
 The Examiner then selected Continental to be that competitor, primarily because he felt that Continental could provide vastly superior beyond-segment benefits. His discussion of the matter follows:
 
 
 34
 Continental will be authorized in the Houston-Miami market. It can give the best public service in this market. It will provide first single-plane service to Miami for Midland/Odessa, El Paso, Tucson, and Phoenix, a total of 16,100 passengers in 1967. Continental estimates its 1969 traffic in these beyond-segment markets at 41,532 passengers if it had Miami-Houston authority. It would provide competitive single-plane service for San Antonio, with 12,420 Miami passengers in 1967. It would provide effective connecting one-carrier service to Miami for Tulsa, Oklahoma City, Wichita, Lubbock, Albuquerque, Amarillo, Denver, Colorado Springs, Seattle-Tacoma, and Portland, with a total of 64,210 passengers in 1967. Continental estimates its 1969 traffic in these latter beyond-segment markets at 22,688 passengers if it had Miami-Houston authority.
 
 
 35
 No other applicant except American is close to Continental in terms of first single-plane and single-carrier service through connecting its system to a Houston-Miami segment, and American's benefits are outweighed by those of Continental. * * *
 
 
 36
 Delta was not mentioned by the Examiner in his discussion of the Houston-Miami market, but he did select it for the Miami-Los Angeles and Miami-San Francisco nonstop routes.
 
 
 37
 On review by the Board, Continental, for the most part, repeated the arguments it made to the Examiner. Delta's brief was concerned with the diversion incident to the increased competition being created for it on certain of its routes. Its only reference to Houston-Miami was that "if Continental should be selected for Houston-Miami, it must be precluded from Miami-California service," to which statement was dropped a footnote suggesting that its concern about Miami-California would be abated if the Houston-Miami award went to itself or to Trans-Texas or to Braniff.
 
 
 38
 On July 24, 1969, coincidentally with Dallas-Phoenix, the Board issued its decision in the Southern Tier case. The Board devoted the first part of its opinion to a discussion of its use of selection criteria:
 
 
 39
 "Naturally, most of our awards in this proceeding are based solely on the carrier selection criteria which have been employed in innumerable past decisions. In no event would we select a carrier to serve a particular market unless we were convinced that it could render effective service, responsive to the needs of the traveling public in that market. Additional factors are [1] the ability to provide benefits to beyond-segment traffic; [2] route integration; [3] identity at the points involved; [4] historic participation in the traffic; [5] diversion; [6] need for strengthening; and [7] other similar factors.
 
 
 40
 "However, a case of this magnitude — particularly one being decided simultaneously or nearly simultaneously with so many other major cases — calls attention to broader considerations. Section 102 of the Act directs the Board to foster a sound and prosperous air transportation system adapted to the needs of commerce, the mails, and national defense. It further directs the Board to foster competition to the extent necessary to achieve such a system; and as we have already noted, the Board has always taken the view that competition in markets which can sustain it, is the best guarantee of good service to the traveling public. But to have competition there must be strong, healthy carriers able to compete. This means that the Board must be concerned with the continued health of all of the members of the industry.
 
 
 41
 * * * * * *
 
 
 42
 "Accordingly, there have been instances where, other factors being closely balanced, we have concluded that the interests of a sound overall air transportation system would be better served by awarding a particular route or market to a large trunk rather than a small one. Usually it is not necessary to advert to the overall balance of the industry to justify such awards, since more often than not the larger carrier will be able to show greater beyond-area benefits, or some other advantage in terms of the route or market immediately at issue. Nevertheless, questions of the balance and health of the industry as a whole are never absent from our considerations — nor, in the light of section 102, could they be." (Emphasis supplied.)
 
 
 43
 In its discussion of the Houston-Miami segment, the Board expressed its full agreement with the Examiner's assessment of the market conditions, National's deficiencies, and the need for competition. The Board said of National:
 
 
 44
 "* * * National has not been diligent in developing the service in this market. While offering 9½ daily round trips between Miami and Houston, only one trip in each direction can be credited with being directed principally to the service needs of this market. Eight of the round trips offered by National are operated as portions of transcontinental flights, and none of these provide nonstop service between Houston and Miami. Two of the westbound flights originate in Miami and terminate in Houston but one of these makes three intermediate stops. The other one is the only nonstop service which National offers the market. There is no eastbound nonstop service and only a single turn-around flight in that direction, a one-stop. The difficulties inherent in attempting to serve a local market only as a part of a long-haul service pattern are well illustrated by National's service in this market. Thus, while operating several daily flights in each direction, National offers no nonstop or one-stop schedule eastbound in the mid-morning, afternoon or early evening. And westbound it offers no such service before 11:00 a. m."
 
 
 45
 However, the Board disagreed with the Examiner on the choice of a competitor for Houston-Miami, and selected Delta. It reached this conclusion by a reasoning process which first focused upon the comparative abilities of Continental and Delta to serve the particular market. This resulted in a conclusion that Continental's greater beyond-segment benefits were balanced by Delta's identity at both terminals. In this assumed condition of balance, it turned to broader considerations not confined to Houston-Miami local service. It remarked that, if Continental were awarded the Houston-Miami run, it would become what the Board termed an "unneeded transcontinental carrier." With greater emphasis, the Board asserted that Continental had received many awards in recent proceedings, and concluded that, before it received any further routes, this relatively small carrier should be given time to "digest" its present gains.[10] By the same token, the Board pointed out that Delta had not fared as well in recent proceedings, although the routes awarded it in the 1961 proceedings had proved highly beneficial, putting it in financial strength right behind the Big Four of domestic carriers — United, TWA, Eastern, and American. Not only had Delta's more recent route awards been sparse, but it was now facing competition on routes which it had formerly monopolized.[11] The Board concluded:
 
 
 46
 "Since the balance of other factors in the Houston-Miami market are quite close — Continental's greater beyond benefits are balanced by Delta's greater identity — we find that considerations of the overall balance of awards militates [sic] decisively in favor of an award to Delta here."
 
 
 47
 Continental then sought reconsideration of this decision as it had in the Dallas-Phoenix case. It urged that Delta's selection on the basis of "overall industry balance" was in error, and furthermore complained that the decision issued in the Southern Tier case involving Houston-Miami was inescapably at odds with the Board's decision in the Dallas-Phoenix case. Emphasis was placed on the public benefits found by the Examiner to reside in Continental's proposal, and Continental challenged the Board's conclusion that these were balanced by the factor of Delta's identity in both Miami and Houston. Continental also reemphasized the importance of the Houston-Miami route to its future development.[12]
 
 
 48
 Petitions for reconsideration were also forthcoming from the Cities of Houston, El Paso, Phoenix, and Tucson. The three last-named, all supporting Continental's bid for the Houston-Miami segment, sought reconsideration on the ground that they had been denied single-carrier service to Miami which they believed the record had shown to be required. Houston contended that Delta could not sustain a meaningful level of nonstop service in the market without back-up traffic. The Board's opinion on reconsideration denied these petitions without further discussion of the Houston-Miami award.
 
 II
 
 49
 We turn our attention in the first instance to No. 23,560, the Dallas-Phoenix case, for the reason that the Board's decision in that case appears to stand on very firm footing indeed. The Board adopted the recommendation of the Examiner that the award go to Delta because, as the Board characterized his findings and conclusions, "that carrier is in the best position to offer the greatest frequency and capacity in the local market and to offer the most new service to beyond segment passengers." Continental, the Board noted, "forecasts no online traffic support." Thus, its proposal was limited to two daily round trips, as compared with the larger number of flights proposed by other applicants possessed of varying degrees of back-up traffic. Delta, with the largest such support, not surprisingly offered the largest volume of new service, i. e., five daily roundtrips; and this, together with the enlarged service coincidentally available to other communities supplying the backup traffic, in the Board's view warranted the award to it.
 
 
 50
 It was for the Board to decide whether the lesser amount of turnaround service which Continental, because of its previous identity at both Phoenix and Dallas, could provide to local passengers between those two points, was outweighed in the public interest by the greater amount of service, not only to local passengers but to a large number of beyond-segment travellers, which Delta proposed.[13] The facts as found by the Examiner and adopted by the Board have not been seriously challenged, if at all; and the conclusions drawn by the Board are both rational and supported by substantial evidence in the record. Continental's sense of grievance seems to us to derive not from any judicially cognizable injury the Board has done it in this case, but from a feeling that the Board has not played by the same rules in the Houston-Miami case. Even if that be true, we see no occasion in it for our disturbing the result reached in Dallas-Phoenix, which impresses us as virtually unassailable on any count.[14]
 
 
 51
 No. 23,561, the Houston-Miami case, does not lend itself so readily to confident disposition in this review proceeding. The claim by Continental that the Board has handled two very similar factual situations in a contradictory way is not without force. After all, two different hearing examiners viewed those situations through the same prism of public interest, and recommended results which, although contemplating awards to Delta in one case and Continental in the other, are rooted in like principles. The Board, however, adopted one recommendation and rejected the other although, in this latter instance, it did not quarrel with the facts as found by the Examiner. These circumstances alone are enough to give us pause and to require a hard look.
 
 
 52
 In the brief filed by counsel for the Board in this court, it is said that "it is apparent from the face of the Board's decision that the transcontinental aspects of the Continental proposal and the need for preserving carrier balance simply outweighed the criteria upon which Continental relied, and which were found to be decisive in the different factual background of the Dallas-Phoenix case." The Board's own descriptive summation of what it did put the matter somewhat differently:
 
 
 53
 "* * * Since the balance of other factors in the Houston-Miami market are quite close — Continental's greater beyond benefits are balanced by Delta's greater identity — we find that considerations of the overall balance of awards militates [sic] decisively in favor of an award to Delta here."
 
 
 54
 We think the difference is significant. Counsel's formulation in the brief makes no reference to the asserted balancing of Continental's "greater beyond benefits" by Delta's "greater identity". It, rather, appears to assume that, no matter how the local factors fell out, the Board looked to the overall route pattern as determinative. If this is an accurate assay of the Board's ratiocinations in this case, it would at least explain why sharp inconsistencies seemingly exist by reference to Dallas-Phoenix.
 
 
 55
 The Board's articulation, contrarily, appears to be that, since the immediate factors were in a state of balance, it could and did look to broader considerations involving the overall distribution of awards.[15] Under this approach, there is at least no inconsistency, if balance did in fact exist. In our reviewing role, it is peculiarly appropriate for us to take the Board at its own word as to what it was doing, and to scrutinize the result in terms of that process. Thus, the question of whether there was a close balance of what we may term the factors immediately relative to the Houston-Miami route becomes an issue of critical significance.
 
 
 56
 The Examiner found that the Houston-Miami market had not been aggressively developed, mainly because the monopoly carrier, National, had provided a negligible amount of nonstop service. A new competitor was needed and, in Continental, the Examiner saw the carrier that could, as he put it, "give the best public service in the market." It would, he found, provide "(1) first single-plane service to Miami for Midland/Odessa, El Paso, Tucson, and Phoenix; (2) competitive single-plane service for San Antonio; and (3) effective connecting one-carrier service for Tulsa, Oklahoma City, Wichita, Lubbock, Albuquerque, Amarillo, Denver, Colorado Springs, Seattle-Tacoma, and Portland." "No other applicant except American," said the Examiner, "is close to Continental in terms of first single-plane and single-carrier service through connecting its system to a Houston-Miami segment, and American's benefits are outweighed by those of Continental. * * *"
 
 
 57
 This emphasis upon the public benefits afforded by the availability to Continental of large amounts of beyond-area passengers is strongly reminiscent of the Board's own words on this score in Dallas-Phoenix, where it regarded this factor as tipping the balance heavily towards Delta and where it followed the Examiner's recommendation to this effect.[16] The Board, in overruling the Examiner in Houston-Miami, did not deny the force of this consideration. It said, rather, that that force was matched by the circumstance that Delta had identity in Houston and Miami which would give it "greater flexibility from an operational standpoint through the bridge between its Houston and Miami terminals," thus enabling it "to support a full service pattern in this market even without the support of back-up traffic."
 
 
 58
 We note, however, that Continental had a long-established identity in both Phoenix and Dallas, but there was no suggestion by the Board in that case that any resulting operational flexibility in positioning its aircraft compensated for Continental's lack of beyond-segment benefits; and, indeed, it is hard to see how the two factors can be thought, without more explication, to be substantially equivalent.[17] We also note that all of the original applicants in Houston-Miami, including Delta, appeared to place a very high estimate on the importance, if indeed not the essentially, of back-up traffic as a financial support for any considerable offering of nonstop flights between the two points. No one applied for Houston-Miami simply upon the basis of turnaround service. Delta, in particular, proposed to serve that segment only as a part of its Miami-Los Angeles and Miami-San Francisco routes. As a result, there is not in this record a schedule proposed by Delta based upon turnaround service between the two points, with which the Board could have compared the five roundtrips per day proposed by Continental.[18] Nor is there any financial estimate by Delta of the operating results of its serving Houston-Miami alone.
 
 
 59
 On petitions for reconsideration, both Continental and the City of Houston question Delta's ability, in terms of profitability, justifiably to provide sufficient service to meet the need. In its own petition for reconsideration, Delta alluded to its lack of "backup support at either end of the route to assist it in becoming competitive with the entrenched carrier, National," and to "the limited traffic available to Delta." Continental asserts that the record shows that Delta will have an unprofitable experience with the Houston-Miami route, in contrast with the profit Delta represented it would earn if its original proposals, treating Houston-Miami as part of a larger route, were accepted. The Board has made no findings on the financial aspects of the Delta award as made, and the Examiner was not called upon to do so because there was not before him any Delta proposal for turnaround service. The question is important in the public interest because it is obvious that the amount of service Delta will be able to maintain depends upon its profit experience.
 
 
 60
 In comparing the respective qualifications of Delta and Continental for the Miami-Houston route, the Board, as we have noted, referred only to beyond-segment traffic as a plus for Continental, and station identity as being to the credit of Delta. It did not refer to Continental's proposal of five daily roundtrip flights as compared with Delta's two. Neither did it refer to the evidence in the record of (1) Continental's proposed economy fare of $52.05, as contrasted with Delta's $63.50, or (2) the promotional expenditures contemplated by Continental as substantially in excess of those of Delta, or (3) the assertedly more comfortable seating pattern of the coach section of Continental's aircraft.
 
 
 61
 Had all or some of these been expressly dealt with, it is at least possible that the Board might not have found the balance between Continental and Delta to be so closely struck. The Board's failure to address itself to these matters hardly comports with our admonition in our Second Braniff case, note 3 supra, that where the question is as to which of two otherwise qualified carriers would better serve the public interest, the Board "must consider and make a relative determination and evaluation of all pertinent factors."
 
 
 62
 The Board, having attributed its rejection of the Examiner's recommendation to the neutralization of Continental's greater beyond benefits by Delta's station identity, went on to make "decisive" its feeling that Continental was due for "at least a temporary pause" in the receipt of new routes.[19] It referred to the circumstance that Delta's "recent" awards had not been so extensive as those of Continental, and that Delta faced greater diversion than did Continental in consequence of the present proceeding. This all may or may not be true; we have no basis of knowing whether it is or not, since we are confronted with abbreviated assertions by the Board rather than explicit findings.
 
 
 63
 In any event, we see no necessity for our coming to grips with the merits of this ground of the Board's decision standing alone. This is so because the Board itself did not regard it as a factor coming into play until it had reached what it considered to be a condition of stalemate in the balancing of the public interest factors bearing directly upon the Houston-Miami service. As indicated above, we do not find that condition of stalemate adequately established by the Board's treatment of the issues, especially against the background of the strongly contrasting approach taken by it in Dallas-Phoenix.[20]
 
 
 64
 The petition for review in No. 23,560 is unavailing, and we leave the Board's action in that case undisturbed. In No. 23,561, we set aside the Board's order awarding the Houston-Miami route to Delta, and remand the case for further proceedings consistent herewith. These may include a reexamination by the Board, with or without the taking of further evidence, of the balance of factors bearing directly upon the route in issue. To avoid disruption of service the Board may permit existing service and route arrangements to remain in effect pending further proceedings. Braniff Airways, Inc. v. CAB, note 15 supra.
 
 
 65
 It is so ordered.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to Title 28, U.S. Code Section 294(c)
 
 
 [1]
 In other words, the award of the Atlanta to Los Angeles route to Delta did not preclude it from stopping at as many intermediary cities as it chose. TheOfficial Airline Guide for the last few years indicates that the traditional points at which Delta has stopped on this route are Birmingham and Dallas.
 
 
 [2]
 The other two proceedings were the Service to Albuquerque Case and the Memphis/Huntsville/Birmingham-Los Angeles Investigation. Delta petitioned the Board to consolidate all these proceedings on the basis of Ashbacker Radio, Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The Board refused, and Delta, among others, petitioned this court to review the decision. In National Air Lines, Inc. v. CAB, 129 U.S.App.D.C. 180, 392 F.2d 504 (1968), this court dismissed the appeal for lack of jurisdiction
 
 
 [3]
 The Federal Aviation Act provides that "[e]very order of the * * * Board shall set forth the findings of fact upon which it is based * * *" 49 U.S.C. § 1485(f). The Administrative Procedure Act directs that the decision of an administrative agency like the Board "shall include a statement of — (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record * * *" 5 U.S.C. § 557(c)See City of Lawrence, Massachusetts v. CAB, 343 F.2d 583 (1st Cir. 1965); Northeast Airlines, Inc. v. CAB, 331 F.2d 579 (1st Cir. (1964)). In the first such case (at p. 588 of 343 F.2d), it was said that "the failure to give intelligible reasons is clear reversible error."
 The Administrative Procedure Act provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be * * * unsupported by substantial evidence * * *" 5 U.S.C. § 706. This precept is made especially applicable to the Board by the Federal Aviation Act, 49 U.S.C. 1486(e). See Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967).
 
 
 [4]
 Single-plane service is a term of art indicating that a passenger who is unable to get nonstop service to a certain destination need not disembark from the plane at an intermediate stop
 
 
 [5]
 
 Eastbound

 Departure
Flight (Phoenix) Stops Flight Itinerary

 200 9:15 a. m. 0 Phoenix-Dallas
 202 6:15 p. m. 0 Phoenix-Dallas

 Westbound

 Departure
 (Dallas)

 201 7:30 a. m. 0 Dallas-Phoenix
 203 4:30 p. m. 0 Dallas-Phoenix
 
 
 [6]
 Identity is a term of art indicating that an airline has some degree of commercial and operational presence at a certain location
 
 
 [7]
 
 Eastbound

 Departure
Flight (Phoenix) Flight Itinerary

 CC 3:00 a. m. Phoenix - Dallas - Shreveport -
 Birmingham - Atlanta - Jacksonville
 - Orlando
 DD 6:00 a. m. Phoenix - Dallas - New Orleans -
 Montgomery - Atlanta
 BB 11:00 a. m. Phoenix - Dallas - Atlanta - Columbia
 - Charleston
 EE 5:00 p. m. Phoenix - Dallas - Atlanta - Jacksonville
 - Orlando
 AA 11:00 p. m. Phoenix - Dallas - Jackson - Atlanta
 - Charlotte

 Westbound

 Departure
Flight (Dallas) Flight Itinerary

 D 12:45 a. m. Atlanta - Montgomery - New Orleans
 - Dallas - Phoenix
 E 8:48 a. m. Orlando - Jacksonville - Atlanta -
 Dallas - Phoenix
 A 11:47 a. m. Charlotte - Atlanta - Jackson - Dallas
 - Phoenix
 B 7:20 p. m. Charleston - Columbia - Atlanta -
 Dallas - Phoenix
 C 11:30 p. m. Orlando - Jacksonville - Atlanta -
 Birmingham - Shreveport - Dallas
 - Phoenix
 
 
 [8]
 Single-carrier service is a term of art indicating that, while a passenger may have to change planes during an intermediate stop, he does not have to transfer to another airline
 
 
 [9]
 
 Eastbound 8:35 AM Westbound 9:00 AM
 1:35 PM 12:30 PM
 4:20 PM 5:15 PM
 7:55 PM 8:00 PM
 3:40 AM 11:40 PM
 National Airlines, the monopoly carrier at that time between Houston and Miami, offered 9½ round trips daily between the two points, but there was only one nonstop flight westbound and no eastbound nonstop service. Many of the other flights had two or three stops.
 
 
 [10]
 Continental received the Dallas-Los Angeles, Albuquerque-San Francisco, and Albuquerque-Chicago awards in the four proceedings instituted by the Board. It had also received awards in other contemporaneous investigations,i. e., the Reopened Pacific Northwest-Southwest Service Investigation, as well as a mainland-Hawaii route in the Domestic Phase of the Transpacific Case. Its Houston-Los Angeles route, however, was opened to competition in the Southern Tier investigation.
 
 
 [11]
 Delta was being exposed to competition on the following routes: Atlanta-Dallas, Atlanta-Los Angeles, Atlanta-San Francisco, New Orleans-Dallas, Dallas-Los Angeles, and Dallas-San Francisco
 
 
 [12]
 One of Continental's concerns was whether the Board had taken into account its loss, by reason of a Presidential veto a few days before the Board's decision, of the United States-South Pacific route. The Board had, however, nowhere referred to this route in totting up Continental's recent route gains
 
 
 [13]
 Turnaround service does not, of course, mean that the aircraft used in it are devoted only to that service. Continental's terminals at both Phoenix and Dallas were for routes down from the north. Planes coming in on those routes would be used to fly the Phoenix-Dallas route. Thus, although turnaround service implies greater reliability in terms of meeting schedules, it still is subject to the hazards of aircraft availability
 
 
 [14]
 In making the award in this instance to the larger trunk rather than the smaller, the Board made no justifying reference to the overall balance of the industry, presumably because, in the language of the earlier statement of general policy in its opinion,supra pp. 752-753, "the larger carrier [was] able to show greater beyond-area benefits * * *."
 
 
 [15]
 In our so-calledFirst Braniff case, Braniff Airways, Inc. v. CAB, 113 U.S. App.D.C. 132, 306 F.2d 739 (1962), this court said that, where two carriers were in a state of balance of respective advantages and disadvantages in relation to a particular route sought by both, the Board could, without contravening its statutory authority, look to broader industry considerations involving the financial position of one of the competitors compared with other carriers of its class. In that case, there appears to have been no serious challenge to the state of balance between the two applicants. We held that the Board's judgment on the broader base of decision was not buttressed by adequate findings.
 
 
 [16]
 Counsel for the Board in this court distinguished Dallas-Phoenix from Houston-Miami on the ground that, whereas 60% of the traffic in the former was connecting in character, such passengers comprised less than 30% of the Houston-Miami market. Continental asserts that this latter figure is 50%. There is no apparent finding resolving these differences, and, in any event, the Board in its opinion did not allude to this matter as entering into its decision
 There was no dispute that the markets are quite comparable in other respects. The projections for 1969 were of 150,000 to 200,000 passengers in Dallas-Phoenix, and of 125,000 in Houston-Miami. The distance between Houston and Miami is 957 miles, between Dallas and Phoenix, 880. Both markets were found to suffer from inadequate nonstop service, and insufficient promotion and development.
 
 
 [17]
 As Continental points out, the ability to move aircraft around between terminals for the greater convenience of the carrier, with some contribution to the expense of doing so by any local passengers that can be picked up, is arguably a private benefit for the carrier. In any event, it hardly seems to be on the scale of public benefits which the Board used to weigh the competing applications inDallas-Phoenix where obviously Continental had in mind this incidental advantage to itself of bridging its aircraft, with a contribution from some revenue passengers, between two of its principal north-south terminals.
 
 
 [18]
 The Airline Guide of January 1, 1970, shows Delta as offering two flights each day between Houston and Miami, both timed quite closely to two of National's flights. This, it is worth noting, is the equivalent of the two round-trips each day proposed by Continental inDallas-Phoenix, which the Board found to compare unfavorably with the five roundtrips per day proposed by Delta in that case.
 
 
 [19]
 It is not clear whether the Board regarded the overall distribution of routes, which it termed "decisive," as comprehending its professed reluctance to create another transcontinental carrier, which it said Continental would become if it could tack Houston-Miami on to its Houston-California authority. We have seen above that Delta, in its brief to the Board, suggested that, if the Houston-Miami route were to stay with Continental as the Examiner had recommended, there should be a restriction which would preclude it from furnishing Miami-California service. And, indeed, it would appear that the only reason Delta thought of itself as a possibility for Houston-Miami was to protect itself against this kind of competition. The Board makes no reference to the availability to it of placing a restriction upon Continental in this regard — a restriction which Continental in its brief tells us is acceptable to it. We have no way of measuring the precise impact of a restriction upon single-plane service between Miami-Los Angeles upon Continental's total back-up traffic
 
 
 [20]
 It is, of course, true that the Board does not have to decide every case the same way; and, as we have recently had occasion to observe, the responsibility for a rational pattern of airline routes, making for a healthy industry and good air transport service for the public, is vested in the Board, not the courts. Its discharge calls for qualifications we do not have, and the Board is to be accorded a latitude commensurate with the peculiar difficulties of its taskSee Frontier Airlines, Inc. v. CAB, 142 U.S.App.D.C. 124, 439 F.2d 634 (decided January 27, 1971). There remains, nonetheless, the statutory requisite of rationality, illuminated and supported by findings supported by evidence of record.