CONTINENTAL AIR LINES,
INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Western Air Lines, Inc., Hughes Air Corporation, d/b/a Hughes Airwest, United Air Lines, Inc., Trans World Airlines, Inc., City of Kansas City, Missouri and Chamber of Commerce of Greater Kansas City, City and County of Denver, Colorado, Public Utilities Commission of the State of Colorado, San Diego Unified Port District, the City of San Diego, San Diego Chamber of Commerce, Intervenors.

No. 74–1651.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 11, 1975.

Decided Sept. 22, 1975.

Thomas D. Finney, Jr., Washington, D.C., with whom Lee M. Hydeman and James T. Lloyd, Washington, D.C., were on the brief for petitioner.

Glen M. Bendixsen, Associate Gen. Counsel, Civ. Aeronautics Bd., Thomas J. Heye, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel and David E. Bass, Atty., Civ. Aeronautics Bd., were on the brief for respondent. Robert L. Toomey, Atty., Civ. Aeronautics Bd., also entered an appearance for respondent.

Emory N. Ellis, Jr., Washington, D.C., with whom Gerald P. O'Grady, Los An-

geles, Cal., was on the brief for intervenor Western Air Lines, Inc. Howard L. Culver, Los Angeles, Cal., also entered an appearance for intervenor Western Air Lines, Inc.

William M. Dickson, Chicago, Ill., was on the brief for intervenor United Air Lines, Inc., Henry L. Hill, Chicago, Ill., also entered an appearance for intervenor United Air Lines, Inc.

John P. Moore, Atty. Gen. of Colorado and Tedford Dees, Asst. City Atty., Denver, Colo., were on the brief for intervenors City and County of Denver, Colo. and The Public Utilities Commission of the State of Colorado.

Aaron A. Wilson, City Atty., Kansas City, Mo., and Nordahl E. Holte, Asst. City Atty., were on the brief for intervenors City of Kansas City, Missouri and the Chamber of Commerce of Greater Kansas City.

Joseph D. Patello, San Diego, Cal., was on the brief for intervenors San Diego Unified Port District, City of San Diego and San Diego Chamber of Commerce.

Richard A. Fitzgerald, San Mateo, Cal., and John W. Simpson, Washington, D.C., entered an appearance for intervenor Hughes Air Corporation, d/b/a Hughes Airwest.

Edmund E. Harvey, New York City, entered an appearance for intervenor Trans World Airlines, Inc.

Laurence K. Gustafson and Howard E. Shapiro, Attys., Dept. of Justice, filed a brief on behalf of the United States of America as amicus curiae urging reversal.

Before WRIGHT and LEVENTHAL, Circuit Judges, and WEIGEL,* United States District Judge for the Northern District of California.

**LEVENTHAL, Circuit Judge:**

Continental Air Lines, Inc. petitions for review of two orders of the Civil Aeronautics Board (CAB) entered in the Board's Additional Service to San Diego Case. The challenged orders—Order 72–12–29, December 8, 1972, and Order 74–5–17, May 3, 1974—rejected the recommendations of the Administrative Law Judge (ALJ) that competitive nonstop authority be certificated between San Diego and Denver.[1] The ALJ had selected Continental to provide the competitive service.

Petitioner contends that the Board's order should be set aside on the ground that the CAB "failed to give adequate weight to the statutory mandate favoring competition" and "failed to engage in reasoned decision-making."[2] The Board responds that its orders were adequately supported by the need for caution at a time when the industry was "plagued by retrenchment and lagging traffic growth" and by the "crucial problem of diminished fuel supplies."[3]

We find that, as a general matter, § 102 of the Federal Aviation Act requires the Board to foster competition as a means of enhancing the development and improvement of air transportation service on routes generating sufficient traffic to support competing carriers.[4] We are cognizant that in some cir-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The challenged orders are set forth at JA 83–98 and JA 100–24, respectively.

2. Brief for Petitioner at 18, 31.

3. Order 74–5–17, May 3, 1974, at 2, 13, JA 101, 112.

4. See text accompanying notes 44–61 infra.

Section 102 of the Federal Aviation Act, 49 U.S.C. § 1302 (1970), states:

§ 1302. Consideration of matters in public interest by Board.

In the exercise and performance of its powers and duties under this chapter, the powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation,

cumstances the other considerations set forth in § 102 may conflict with and predominate over the public interest in competition.[5] The Board urges in effect that here the need to foster sound economic conditions in view of the industry's financial posture and the fuel situation overrides the benefits of competition. After a careful examination of the record, we conclude that the Board's position is not supported by substantial evidence and that its rejection of competitive nonstop service in the San Diego-Denver market is not in accord with the public interest considerations set forth in § 102 of the Act. Accordingly, we remand the case for further proceedings consistent with Part IV of this opinion.

## I. *Background*

We begin with a summary of the seven years of administrative proceedings culminating in the orders under review.

The challenged orders are the last of a series of CAB rulings entered in the Additional Service to San Diego Case. That proceeding arose out of an application filed by United Air Lines on January 12, 1967, requesting permission to provide nonstop service in several San Diego markets.[6] On May 26, 1967, the CAB issued a show cause order which rejected United's San Diego-Denver nonstop request, but proposed to give Unit-

ed nonstop authorization for the San Diego-New York and San Diego-Chicago routes.[7] In response to the City of Denver's petition for reconsideration, the Board *sua sponte* issued a second order to show cause why Western Air Lines, the primary San Diego-Denver carrier, should not be permitted to provide nonstop service in that market.[8] The Board's proposals prompted numerous objections and competitive filings from other airlines. By order of April 3, 1968, the CAB instituted the Additional Service to San Diego Case, setting a consolidated hearing on applications for nonstop authority between San Diego and New York/Newark, Washington/Baltimore, Chicago and Denver.[9]

Following the submission of briefs by numerous carriers and local groups and three days of hearings, the ALJ issued his initial decision on September 4, 1969. The ALJ recommended that competitive nonstop authority be authorized in all four markets under consideration. With regard to the San Diego-Denver market, he adopted the Bureau of Operating Rights' forecast that there would be "not less than 100,335 passengers in 1970." Based on this "conservative" estimate he found "ample traffic to support two carriers on an economic basis without regard to the support of through traffic flowing over the route."[10] The ALJ se-

---

and to improve the relations between, and coordinate transportation by, air carriers;

(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(e) The promotion of safety in air commerce; and

(f) The promotion, encouragement, and development of civil aeronautics. (Pub.L. 85–726, Title I, § 102. Aug. 23, 1958, 72 Stat. 740.)

5. *See United States v. CAB,* 167 U.S.App.D.C. 313, 320, 511 F.2d 1315, 1322 (1975) ("the statute would appear to contemplate

that the factor of competition could be outweighed by one or more of the other factors").

6. *See* Initial Decision of Hyman Goldberg, Hearing Examiner, September 4, 1969, at 2, JA 373.

7. Order to Show Cause, Order No. E–25202, May 26, 1967, at 4, JA 24.

8. Order to Show Cause, Order No. E–25727, September 22, 1967, at 1 & n. 1, JA 27 & n. 1.

9. Order No. E–26608, April 3, 1968, at 4, JA 33.

10. *See* Initial Decision, *supra* note 6, at 64 & n. 115, JA 435 & n. 115. The ALJ deemed the Bureau's forecast conservative because its base year traffic figures did not include "on-line connecting passengers" and its stimulation factor—growth attributed to new, improved service—did not take account of Continental's attractive fare proposals.

lected Western and Continental to provide the competing nonstop service. Western was a "logical choice" because it carried the great bulk of the San Diego-Denver passengers on its one stop flights routed via Phoenix.[11] Continental was chosen ahead of United, TWA and Air West as the second carrier because of United's past "record of neglect and indifference" toward the market and because of Continental's superior proposed pattern of service; attractive fare schedules; substantial beyond market benefits; and history as "an extremely vigorous, aggressive, and efficient carrier." [12]

The CAB exercised its right of discretionary review of the ALJ's initial decision, issuing its opinion on April 9, 1970.[13] The Board adopted the ALJ's findings regarding the need for competitive nonstop service in the Chicago, New York/Newark, and Washington/Baltimore markets but decided, by a vote of 3–2, to certificate only one nonstop carrier, Western, in the San Diego-Denver market. This departure from the ALJ's determination rested primarily on the majority's view that "the examiner's forecast may be too optimistic" given "the recent lag in nationwide traffic growth." [14] Although the CAB noted that a competitive authorization would provide a spur to better service and significant benefits to beyond segment markets, it concluded that Western's possible "sizeable operating loss if competitive service is instituted" in conjunction with the adequacy of Western's proposed service to meet the needs of the market rendered a denial of a competing nonstop carrier certification "more consistent with the goal of fostering sound economic conditions in air transportation. . . ." [15] The dissenting Board members emphasized that the projection of 100,335 passengers (275 per day) in 1970 was "a very conservative estimate" which did not include either "true San Diego passengers who are reported as Los Angeles passengers (because they traveled from Los Angeles to San Diego by surface transportation or intrastate airlines) or "the substantial number of passengers carried between these points who will move beyond Denver to points on the routes of both Western and Continental." [16] In addition, the dissent noted that within the past year the Board had made grants of competitive nonstop service in a number of substantially smaller markets.[17]

11. See id. at 65, JA 436.

12. See id. at 66–76, JA 437–47.

Continental proposed three "conveniently timed" round trips a day and offered "not only first-class and coach service, at substantial reductions in fares, but also . . . the economy service for which the carrier is well-known, at considerably reduced fare levels." In contrast to TWA, it offered 3–2 seating in coach and economy sections instead of less comfortable 3–3 seating. Continental's selection would also provide a substantial number of passengers in four beyond markets either first single-plane or first single-carrier service—a factor of prime importance. The ALJ considered Continental's efficiency and aggressiveness important in view of Western's "long-entrenched" position in the market. Finally, in addition to service, scheduling, and beyond market advantages over TWA, Continental was given a plus as a far smaller carrier to which the award would "be more important" than to TWA. Air West was passed over because its shaky financial position made it doubtful that it could offer Western "effective, dynamic competition."

13. See 14 CFR §§ 385.50–.54 (1975) (delineating the discretionary review procedure).

14. Opinion 70–4–46, April 9, 1970, at 2, 4, JA 39, 41.

15. Id. at 4 & n. 6, JA 41 & n. 6. The Board also noted that the examiner had relied in part on Western receiving new revenue from San Diego-New York/Newark and San Diego-Washington/Baltimore awards which the Board decided to grant to United. Id. at n. 7.

16. Concurring and Dissenting Opinion of Members Murphy and Minetti in Opinion 70–4–46, at 1, JA 49.

17. Id. at 1–2 & n. 1, JA 49–50 & n. 1. A partial list of such awards showing O & D plus

A number of parties, including Continental, sought reconsideration of the Board's determination. Petitioner claimed that the majority lacked substantial evidence to support its determination that the traffic forecast of the ALJ and the Bureau of Operating Rights was too optimistic. It noted that the lag in national traffic had not affected the market at issue—the San Diego-Denver market had grown 34% between 1967 and 1968 and both San Diego and Denver experienced an increase in total traffic well in excess of the national average. Continental reinforced its argument by pointing out that the traffic estimates of three other carriers paralleled or exceeded the ALJ's forecast and that the ALJ's figure was significantly understated because of the factors noted by the dissenting members.[18]

The CAB, by order of June 5, 1970, deferred action on the petitions to reconsider certification of a second nonstop carrier between San Diego and Denver. In its Supplemental Opinion and Order on Reconsideration of March 23, 1971, the Board, by an identical 3–2 vote, reaffirmed its previous denial of competitive service. The majority conceded that the San Diego-Denver market "maintained a healthy growth rate in calendar year 1968," but argued that 1969 traffic data demonstrated that "the market is by no means an exception to the nationwide slowdown."[19] Using more recent traffic figures and a 1971 forecast year, the majority calculated that "Continental's certification would produce an operating loss of about $84,000 for Western in 1971. . . ." The Board concluded that harm to Western "at a difficult period for the industry as a whole and Western in particular" outweighed the "significant factors" favoring certification such as substantial beyond segment benefits and profitable operation for Continental.[20] The dissenters claimed that "[t]here can be no serious question . . . that this market is large enough to support competition," emphasizing that the majority's projection for 1971 yielded a larger traffic volume than the ALJ had found sufficient to support competition using a 1970 target year.[21] They found that the possibility of a temporary loss by Western in 1971 was overshadowed by public benefits from improved service which Continental's competitive flights would provide in the San Diego-Denver market and in other related markets.[22]

interline connecting traffic projected for the forecast year included:

| | |
|---|---|
| Houston-Seattle/Portland | 150 |
| Denver-San Antonio | 194 |
| Denver-Portland | 220 |
| Salt Lake City-Seattle | 222 |
| Salt Lake City-Portland | 138 |
| Houston-St. Louis | 272 |
| San Antonio-Washington | 176–224 |
| New Orleans-Tampa (3 carriers | 206 |
| Houston-Miami | 280 |
| Dallas-Tampa | 158 |
| Albuquerque-Las Vegas | 206 |
| Albuquerque-San Francisco | 190–330 |
| Memphis-New Orleans | 246 |

18. Petition of Continental Air Lines, Inc., for Reconsideration of Order 70–4–46, May 4, 1970, at 2, 5–6, JA 211, 214–15.

| Party | Annual | Daily |
|---|---|---|
| Air West | 98,870 | 271 |
| Continental | 101,222 | 277 |
| TWA | 117,240 | 320 |
| Western | 94,216 | 258 |
| Bureau | 100,335 | 275 |

Since Western's forecast assumed monopoly service, it would have to be increased to obtain an estimate for the size of a competitive market.

19. Order 71–3–135, March 23, 1971, at 2, JA 68.

20. *Id.* at 4–5, JA 70–71.

21. Dissenting Opinion of Members Murphy and Minetti in Order 71–3–135, at 1, JA 72. The majority forecasted 103,124 passengers in 1971 as compared with the ALJ's 1970 forecast of 100,335. *See* Order 71–3–135, March 23, 1971, Appendix A, at 2, JA 78.

22. Dissenting Opinion, *supra* note 21, at 4, JA 75. The dissenters also challenged the majority's loss projection on the basis of its underestimation of passengers by ignoring surface and intrastate Los Angeles-San Diego traffic and using atypical 1969 growth rate figures and its overestimation of costs.

Shortly after issuance of its supplemental opinion, the Board discovered that its financial calculations had erroneously rested on fiscal rather than calendar 1971 traffic estimates and consequently had underforecast 1971 traffic volume. Corrected estimates revealed that, in competition with Continental, Western's 1971 profits would range from slightly below to somewhat above the break-even level. The CAB stated: "These revised figures render extremely close the balance of decisional criteria—harm to Western under existing economic conditions weighed against public benefit factors favoring competition and improved beyond service—in determining whether such competition should be authorized." Under these circumstances, the Board, by order of April 16, 1971, remanded the competition question to the ALJ for an analysis of "the most recent traffic and cost data and Western's actual experience with nonstop service in the market." [23]

The remand proceeding culminated in a 92-page Supplemental Initial Decision issued on March 20, 1972. The decision found a second nonstop carrier warranted by the size of the market in the 1972 and 1973 forecast years, the serious deficiencies and omissions in Western's service, and Western's ability "to achieve a substantial operating profit" in each of the forecast years in competition with another nonstop carrier.[24] The ALJ accepted as reasonable the Bureau of Operating Right's traffic estimate of 118,520 passengers in 1972 and 127,409 in 1973 and its related projection of an operating profit for Western of $417,000 in 1972 and $325,000 in 1973.[25] The supplemental decision faulted Western's San Diego-Denver service for scheduling inadequacies and high load factors.[26] The ALJ selected Continental to compete with Western for substantially the same reasons contained in his initial decision.[27]

The Board, 3–2, again reversed the ALJ and declined to authorize competitive nonstop service. The majority members expressed concern that, "during a period of lagging traffic growth and retrenchment within the industry, and during the subsequent period of recovery before an adequate upward trend has been assured," the agency "must be more than usually careful to avoid impeding the industry's opportunities for full recovery." [28] It concluded that certification of competition would be imprudent since Western's service had been "reasonably responsive to the needs of the market" and since competitive service was "likely to produce, at best, only marginal financial results." [29] The Board found the ALJ's and the Bureau's traffic forecast "too optimistic" and set forth a number of adjustments in their growth and stimulation percentages which reduced the 1973 traffic estimates by 29,000 passengers.[30] Although the Board made no profit or loss calculations of its own, it concluded that "the prospect for profitable two-carrier operation is tenuous at this time." [31]

Continental's detailed petition for reconsideration took issue *inter alia* with the Board's adjustments to the ALJ's traffic forecast. In particular, it questioned the majority members' reliance on experience during recession years to support its forecast of a 3 percent growth rate for 1972 and 1973, in view of the

23. Order on Remand, Order 71–4–112, April 16, 1971, at 1, JA 79.

24. Supplemental Initial Decision of Hyman Goldberg, Hearing Examiner, March 20, 1972, at 55, JA 585.

25. *Id.* at 56, 75, JA 586, 605.

26. *See id.* at 59–65, JA 589–95. Among the "many serious inadequacies" were findings that the carrier did not provide prime time departures in both directions, that there were significant service gaps, that Western served the market only as part of long-haul flights, and that load factors indicated "unresponsive scheduling on Western's part." Although Western had proposed to provide three nonstop round trips, it had never flown more than two daily nonstop round trips.

27. *See id.* at 77, JA 607–17; note 12 *supra*.

28. Opinion 72–12–29, December 8, 1972, at 2, JA 85.

29. *See id.* at 3, JA 86.

30. *See id.* at 8–10, JA 91–93.

31. *Id.* at 8, JA 91.

Board's earlier finding that the recession was a "temporary phenomenon." [32] As proof of the Board's error, Continental noted that, as a result of substantial growth, Western's traffic figures revealed that the market was significantly larger at the end of 1972 than the Board had predicted it would be a year later.[33]

On May 3, 1974, fifteen months after the opinion following the remand, the Board issued an Opinion and Order on Reconsideration reaffirming, by a 2–1 vote, its denial of a competitive nonstop certification. This final opinion in these extended proceedings reiterates the Board's "policy of caution" and expresses its "resolve to avoid making unnecessary awards of competitive authority on routes which are adequately served.[34] Noting recent traffic growth data, the Board conceded "that the prospects for profitable competitive operations are far stronger than earlier believed" and that "competitive service would be more profitable than originally anticipated—although not as profitable as Continental claims." [35] However, without further explication, it stated that "the Board's original decision did not turn on profitability alone. . . ." [36] Despite the improved financial outlook for competition and the benefits it offered, the Board determined that, given the general state of the industry and the recent onset of the fuel shortage, "a competitive authorization is unnecessary and undesirable at this time." [37]

The dissenting member emphasized that traffic data indicated that the ALJ's 1973 forecasts "were on sound ground, indeed if anything conservative" and that there would likely be "well over 150,000 annual passengers" for fiscal 1975, the earliest possible first year of competitive operations.[38] He commented: "Overall, it is hard to avoid the impression that the majority is not really interested in whether competitive service would be profitable, and has effectively eliminated this as a decisional factor." [39] Nor did he find any warrant for a denial of competitive service in the fuel situation. In view of Western's scheduled four and a half nonstop roundtrips, the dissent noted that "competitive service in this market is possible today without materially increasing overall jet fuel consumption or reducing service in other, perhaps more essential markets." [40]

On June 25, 1974, Continental filed a petition for review of the Board's 1972 order and its 1974 order on reconsideration.[41]

## II. Competition and the Public Interest Standard of the Federal Aviation Act

■ Continental urges that the challenged orders must be set aside in part because the Board failed to give adequate weight to the governing statute's mandate favoring competition.[42] Petitioner's contention rests both on an assessment of the general importance of competition in the statutory scheme and

32. Petition of Continental Air Lines, Inc. for Reconsideration of Order 72–12–29, January 29, 1973, at 20, JA 313, *quoting* Domestic Passenger Fare Investigation, Order 71–4–54, at 28.

33. Petition, *supra* note 32, at 20, JA 313.

34. Opinion and Order on Reconsideration, Order 74–5–17, May 3, 1974, at 2, JA 101.

35. *Id.* at 3, 13, JA 102, 112.

36. *Id.* at 3, JA 102.

37. *Id.* at 8, JA 107.

38. Dissent of Member Minetti in Order 74–5–17, at 2, JA 121.

39. *Id.* at 3 n. 4, JA 122 n. 4.

40. *Id.* at 4–5, JA 123–24.

41. The following carriers and local representatives intervened in the action: Western Air Lines, Inc., Hughes Air Corp. d/b/a Hughes Air West, United Air Lines, Inc., Trans World Airlines, Inc., City of Kansas City, Missouri and Chamber of Commerce of Greater Kansas City, City and County of Denver, Colorado, Public Utilities Commission of the State of Colorado, San Diego Unified Port District, The City of San Diego, and the San Diego Chamber of Commerce. Western filed a brief in support of the CAB and the local interests filed briefs urging competitive service. The court granted leave to the Department of Justice to file an *amicus* brief. *Amicus* supported petitioner's challenge to the CAB's order.

42. Brief for Petitioner at 18–31. Petitioner also argued that the Board's orders must be

an analysis of the Board's treatment of the record in view of that scheme. As shall be seen, these two aspects of petitioner's argument implicate distinct questions of statutory interpretation and substantial evidence. We turn first to an examination of the role of competition, in order to develop a framework for evaluating the record to determine whether the Board's decision is supported by substantial evidence and evinces a "fidelity to the functions assigned to the regulatory agency by the Congress." [43]

"Competition to the extent necessary" is one of the six public interest factors set forth in § 102 of the Federal Aviation Act to guide the CAB "[i]n the exercise and performance of its powers and duties." [44] The parties present divergent interpretations of § 102 and its competition subsection, § 102(d). Continental contends that the Act creates "a 'strong presumption' in favor of competition." [45] The CAB's brief argues that the statute "contemplates that competition may or may not be 'necessary'" and that competition is not *per se* favored "where it endangers other policy goals in the public interest, such as the achievement of efficient, economical service or the fostering of sound economy of operations." [46] Intervenor Western opines that in view of the origin of the Act "it is apparent Congress contemplated that as to Section 102(d) the emphasis would be, not on the word 'competition,' but on the remainder of the phrase: to the extent necessary to assure the sound devel-

opment of an air transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense." [47] An examination of the origins of the statute and of its "contemporaneous construction" by persons "charged with the responsibility of setting its machinery in motion" [48] clarifies the intended meaning of § 102(d) and the relationship between competition and the other public interest factors.

Congress first established a comprehensive system for regulation of air transportation through the Civil Aeronautics Act of 1938. [49] The legislative history of that act makes clear that the statute was designed to correct the abuses of unrestrained competition among carriers. The Senate Report on the proposed legislation warned that "[c]ompetition among air carriers is being carried to an extreme, which tends to jeopardize and render unsafe" air transportation and urged the "immediate enactment" of the bill to "promote an orderly development of our Nation's civil aeronautics" and to "prevent the spread of bad practices and of destructive and wasteful tactics resulting from the intense competition now existing within the air-carrier industry." [50] In floor debates, Congressman Randolph cited "rate war, cutthroat devices, and destructive and wasteful practices" as evidence that "[t]he industry has reached the point where unbridled and unregulated competition is a public menace." [51]

set aside for failure to engage in reasoned decisionmaking. *Id.* at 31–48. We believe that this case is most naturally treated as presenting a question of the existence of substantial evidence to support the CAB's rejection of the statutory interest in the promotion of competition.

43. *See Public Service Comm'n, State of N. Y. v. FPC (Texas Gulf Coast Area Rate Cases),* 159 U.S.App.D.C. 172, 208–09, 487 F.2d 1043, 1079–80 (1973), *vacated and remanded sub nom. Shell Oil Co. v. Public Service Comm'n,* 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974).

44. Section 102 is set forth at note 4 *supra.*

45. Reply Brief for Petitioner at 2.

46. Brief for Respondent at 20, 22.

47. Brief for Intervenor Western Air Lines at 30.

48. *Power Reactor Development Co. v. International Union of Electrical Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), *quoting Norweigian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

49. 52 Stat. 973 (1938).

50. *S.Rep.No.* 1661, 75th Cong., 3d Sess. 2 (1938); *see H.R.Rep.No.* 911, 75th Cong., 1st Sess. 19 (1937).

51. 83 *Cong.Rec.* 6507 (1938).

However, Congress made it clear that while it was moving to safeguard against the excesses of destructive and unrestrained competition, it was in favor of the competitive principle and opposed to a policy of monopoly. In the debates, Senator McCarran stressed that the Act established a "nonpolitical agency" that would focus on the public interest of avoiding destructive competition where *e. g.,* United Air Lines already serves Chicago to Salt Lake City, and the agency rejects another applicant who wants to serve the route, "because if you do both lines will fail. . . ." He added:

> [This] is not to say that any line may be "frozen" nor that any line may be perpetuated, nor that any monopoly over any terrain may be established to the exclusion of the necessity which the public may present.[52]

Other speakers likewise evinced a clear intent to protect against the evils of monopoly. Senator Borah, for example, stated: "I have no doubt of the intent of the framers of this proposed legislation to inhibit or prohibit monopoly. . . ."[53] And Senator Copeland, Chairman of the pertinent committee, pointed to the "competition to the extent necessary" language in the declaration of policy section—§ 2 of the 1938 Act which was reenacted in 1958 as § 102 of the Federal Aviation Act—as one of "five places in the pending bill where the question of monopoly is dealt with in one way or another with the view to its control and prevention."[54]

The central point is that this was one of an emerging group of statutes that did not regulate the so-called "natural monopolies" that identified conventional public utility regulation, but instead called for "regulated competition," achieving the benefits of competition without the evils of unrestrained entry or under-cost rate wars.

It is significant that Congress, addressing itself to the air transport industry, deliberately fashioned this 1938 law so as to identify competition in express language as a key element of the public interest. During the Senate debate it was emphasized that both of the 1938 bills—the McCarran bill and the Administration substitute—altered the general declaration of policy contained in earlier bills to take "explicit recognition of the importance of competition to the extent necessary to assure the sound development of air transport."[55]

Numerous early CAB opinions provide insight into the intended role of competition in the new regulatory scheme. In one of its first decisions the Board stated: "Reference to both the legislative history and to the text of the act demonstrates the congressional intent to safeguard an industry of vital importance to the commercial and defense interests of the Nation against the evils of unrestrained competition on the one hand, and the consequences of monopolistic control on the other."[56] The CAB read the inclusion of an express reference to competition in § 2 to render inapplicable doctrine developed under other transportation regulatory schemes that competition should not be authorized where an existing carrier was furnishing adequate service and stood ready to meet any additional service needs of the public.[57] The Board stated explicitly

---

52. 83 *Cong.Rec.* 6852 (1938). Senator McCarran was the author of the original Senate bill.

53. 83 *Cong.Rec.* 6730 (1938).

54. *Id.* Senator Copeland was chairman of the Senate Commerce Committee which conducted the hearings on the bill.

55. 83 *Cong.Rec.* 6726 (1938) (comparison of bills submitted by Senator Truman).

56. *Acquisition of Western Air Express Corp.,* 1 CAA 739, 749–50 (1940) (a § 408 case), *cited*

with approval in *Additional North-South California Services Case,* 4 CAB 373, 374 (1943) (interpreting § 2 in a route award proceeding).

57. *See American Export Airlines, Inc.,* 2 CAB 16, 29–31 (1940).

Subsequent CAB decisions have firmly established that, in considering the extent to which competition is necessary to the sound development of the air transportation system, the Board "has not been guided by the nega-

that when "competition will be neither destructive nor uneconomical. . . the Board is directed to implement competition" because it generally promotes the other public interest factors set forth in § 2.[58] Thus the CAB concluded in the *Additional North-South California Services Case*:

> While no convenient formula of general applicability may be available as a substitute for the Board's discretionary judgment it would seem to be a sound principle that, since competition in itself presents an incentive to improved service and technological development, there would be a strong, although not conclusive, presumption in favor of competition on any route which offered sufficient traffic to support competing services without unreasonable increase of total operating cost.[59]

And it further explained in the *Hawaiian Case*:

> The greatest gain from competition . . . is the stimulus to devise and experiment with new operating techniques and new equipment, to develop new means of acquiring and promoting business, including the rendering of better service to the customer and to the Nation . . . . Competition invites comparison as to equipment, costs, personnel, methods of operation, solicitation of traffic, all of which tend to assure the development of an air transportation system as contemplated by the Act.[60]

■ The legislative history and the early CAB decisions indicate that there is no presumption in favor of competition *per se* because competition may prove uneconomical and destructive of the healthy development of the industry if the relevant market is too small to support competing carriers. But when sufficient traffic exists to support competition, certification of competing carriers is mandated by the Act as providing the best means of effectuating the other public interest goals contained in § 102.[61]

■ We place substantial reliance on this view of the role of competition both because of the particular respect due a "contemporaneous construction of

---

tive concept of determining first whether the existing services met minimum standards of legal adequacy." *Southwest Northeast Service Case,* 22 CAB 52, 60 (1955). Although inadequacy of existing service is a factor to be weighed heavily in assessing the need for a competitive spur, the presence of adequate service by a monopoly carrier does not supplant the statutory recognition of the desirability of competition. *See, e. g.,* Domestic Passenger-Fare Investigation, Order 71–4–54, April 9, 1971, at 27 ("We have stated that major markets require competition regardless of the quality or quantity of service provided by monopoly carriers."); *Syracuse-New York City Case,* 24 CAB 770, 790 (1957) ("as to the principal criteria for authorizing competing service: the size, importance, and potential are the prevailing factors—not adequacy of service"); *Hawaiian Case,* 7 CAB 83, 103 (1946); *Additional North-South California Services Case,* 4 CAB 373, 375 (1943).

58. *See, e. g.,* Domestic Passenger-Fare Investigation, Order 71–4–54, April 9, 1971, at 27; *Seaboard & Western Airlines, Inc., Mail Authorization,* 29 CAB 49, 85 (1959); *Southern Service to the West Case, Reopened,* 18 CAB 790, 799–800 (1954); *Trans-Pacific Airlines, Ltd.,* 12 CAB 900, 901 (1951); *IATA Agency Resolutions Proceeding,* 12 CAB 493, 509 (1951); *Colonial Airlines, Inc., et al., Atlantic Seaboard Operation,* 4 CAB 552, 555 (1944).

59. 4 CAB 373, 375 (1943).

60. 7 CAB 83, 103–04 (1946).

61. The CAB has repeatedly noted the unique advantages to improved service offered by competition. *See, e. g., North Atlantic Route Case,* 6 CAB 319, 326 (1945) ("No effective substitute for healthy competition as a stimulus to progress and efficiency can be found in monopoly."); *Colonial Airlines, Inc., et al., Atlantic Seaboard Operations,* 4 CAB 552, 555 (1944) ("The improvements which flow from competitive service cannot be obtained by administrative fiat. There is no regulation conceivable which could assure courtesy by a carrier's employees, for example, and it would be extremely difficult to attempt to dictate many other matters affecting the quality of service rendered."). In the present proceeding, the Board noted that "competition ultimately holds the greatest potential for vigorous development of air transportation." Order 72–12–29 at 3, JA 86.

a statute by men charged with the responsibility of setting its machinery in motion" [62] and because the Board "has from the outset consistently taken" that position.[63] Although Continental and the Department of Justice, as *amicus curiae*, charge that this case is indicative of the Board's recent unannounced abandonment of this view and adoption of a route freeze policy,[64] we need not address that claim in view of the Board's failure to articulate its actions as a fundamental change in policy. "In our reviewing role, it is peculiarly appropriate for us to take the Board at its own word as to what it was doing, and to scrutinize the result in terms of that process." [65] We thus proceed to an examination of the Board's treatment of the record to determine whether there is substantial evidence indicating either that the San Diego-Denver market lacks sufficient traffic potential for healthy competition or that another public interest consideration outweighs the significant benefits afforded by competition.[66]

### III. *Lack of Substantial Evidence to Support Rejection of Competition*

■ The post-remand orders under review in this case set forth two justifications for rejecting the ALJ's recommendation that competitive nonstop service be certificated for the San Diego-Denver market—maintenance of the economic health of the industry and the fuel shortage. Although a comprehensive analysis would pinpoint a number of shortcomings in the CAB's opinions, we find that a focused examination of the evidence supporting these two core rationales is entirely sufficient to demonstrate the lack of substantial evidence to underpin the Board's rejection of competition.

### A. *Promotion of Sound Economic Conditions*

In its initial orders culminating in a remand for further proceedings on the issue of competitive nonstop service, the Board concentrated on the economic threat to Western posed by authorization of a competing carrier. Although the ALJ had found that the market would be large enough to support competition in 1970, the initial forecast year, the Board concluded that the projection was too optimistic "[i]n view of the recent lag in nationwide traffic growth" and credited Western's "gloomy forecast" of "a sizeable operating loss if competitive nonstop service is instituted." [67] When Continental petitioned for reconsideration on the basis that the record showed

---

**62.** *Power Reactor Development Co. v. International Union of Electrical Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), *quoting Norweigian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933); *see NRDC v. Train,* 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1974).

**63.** *Trans-Pacific Airlines, Ltd.,* 12 CAB 900, 901 (1951); *see* Southern Tier Competitive Nonstop Investigation, Order 69–7–135, July 24, 1969, *quoted in Continental Air Lines, Inc. v. CAB,* 143 U.S.App.D.C. 330, 338, 443 F.2d 745, 753 (1971) ("The Board has always taken the view that competition in markets which can sustain it is the best guarantee of good service to the traveling public."); Domestic Passenger-Fare Investigation, Order 71–4–54, April 9, 1971, at 27 ("One of our principal policies has been that the traveling public is entitled to the benefit of competition whenever it is justified by existing and projected market traffic.).

**64.** *See* Reply Brief for Petitioners at 13–16; Brief for United States as *Amicus Curiae* at 31–34.

**65.** *Continental Air Lines, Inc., supra* note 63, at 341, 443 F.2d at 756.

**66.** The CAB's counsel at oral argument on appeal stated that the Board recognized "the prime value of competition" and asserted that "the Board's interpretation of the statute would be that competition would be mandated" where two carriers could achieve a profit and a reasonable return and absorb the new route without adverse impact on their system-wide operations. Accordingly, Board counsel stated that "the question would turn on the evidence in the record as to the projections going to traffic growth and the projections going to revenues that would be received if competition were instituted."

**67.** Opinion 70–4–46, April 9, 1970, at 4, JA 41.

substantial growth in the San Diego-Denver market contrary to the national trend, the Board responded that "more recent O & D data demonstrates [sic] that the market is by no means an exception to the nationwide slowdown." [68] The CAB went on to project an $84,000 operating loss for Western in 1971 under competition with Continental and to conclude that "Continental's advantages" were outweighed "by the harm the carrier would cause to Western's operations . . . at a difficult period for the industry as a whole and for Western in particular." [69] When discovery of an error erased the $84,000 loss projection, the Board altered its analysis of the competition issue. It remanded the question for further proceedings, stating that "[t]hese revised figures render extremely close the balance of decisional criteria—harm to Western under existing economic conditions weighed against public benefit factors favoring competition and improved beyond service. . . ." [70]

Significantly, by the time of the last CAB order in May, 1974, the Board had abandoned its reliance on the threat of competition to the profitability of Western's San Diego-Denver service. The ALJ and the CAB's Bureau of Operating Rights again found that there would be substantial growth in the market in both the 1972 and 1973 forecast years and projected that both Western and Continental would achieve sizeable profits in each of those years. [71] The Board again deemed the ALJ and Bureau of Operating Rights' traffic forecast "too optimistic", making numerous downward revisions in the ALJ's forecasting assumptions and concluding that the competitive service was "likely to produce, at best, only marginal financial results." [72] In contrast to its pre-remand orders, the Board did not make the key bottom line profit and loss calculation in its 1972 order or include any reference to the financial status of Western and Continental. Implicit in the Board's decision was its belief that any doubts as to the profitability of competition should be resolved against certification of a second carrier "to avoid impeding the industry's opportunities for full recovery." [73]

The CAB argues that its analysis of traffic projections and balancing of public interest factors involve a "specialized task" that is "within the Board's special province" and that the court should defer to the agency's expertise in these technical matters. [74] In response, Continental identifies a number of danger signals that serve to alert the court to the Board's failure to engage in a reasoned application of its expertise—a predicate to restrained and deferential judicial review of an agency's actions. [75] It points to the ever-shifting basis of the Board's decisions, the inexplicable delay in prepa-

**68.** Order 71–3–135, March 23, 1971, at 2, JA 68.

**69.** *Id.* at 4–5, JA 70–71. The Board relied solely on 1969 growth figures in projecting 1971 traffic. The CAB did not distinguish earlier decisions refusing to base determinations on short-term, recession traffic data. *See New York-San Francisco Nonstop Service Case,* 29 CAB 811, 815 (1959).

**70.** Order 71–4–112, April 16, 1971, at 1, JA 79.

**71.** *See* text accompanying notes 24–25 *supra.*

**72.** Opinion 72–12–29, December 8, 1972, at 3, 8–12, JA 86, 91–95. The Bureau's forecast had used a 7.5% annual growth rate, a 15% stimulation figure, and estimated that 30% of the San Diego-Twin cities traffic would travel on Western via Denver. Using 1968–71 figures, and discounting for presumed stimulation from Western's commencement of nonstop flights, the Board selected a 3% growth rate for 1972 and 1973. Yet, at the time the Board adopted its 3% figure based on recession experience, it had Western's projection of a 10% growth rate and Western's traffic data through April, 1972, showing a 12% increase for the first four months of 1972 over the first four months of 1971. *See* Brief for Petitioner at 39–40. The Board also failed to note or to explain adequately the result that its 1973 forecast of 98,409 (the ALJ's forecast of 127,409 minus the reduction of 29,000 passengers resulting from the Board's adjustments; JA 93) was substantially lower than its corrected projection of 106,851 passengers for 1971.

**73.** Opinion 72–12–29, at 2, JA 85.

**74.** Brief for Respondent at 22, 38–39.

**75.** *See Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

ration of agency orders, and the persistent conservative downgrading of the ALJ's and staff's traffic forecasts in the teeth of data revealing significant growth as danger signals indicating that the Board's adjustments and conclusions are a product of "result-oriented" rationalization.[76]

We are not required to rule on this contention, to evaluate the strength of these danger signals or to consider whether they undercut the deference normally accorded to agency analyses of technical traffic matters. These matters have been obviated by the Board's May, 1974 Opinion and Order on Reconsideration, which concedes the need for adjustment of its forecast and states that competition would be profitable.[77] Subsequent additions to the traffic data that were before the Board prior to its 1972 order convincingly demonstrated that the majority members severely underestimated the size of the market.[78] Faced with these figures, the Board acknowledged what could not fairly be denied— "the prospects for profitable competitive operations are far stronger than earlier believed" and "competitive service would be more profitable than originally anticipated."[79]

But then the Board brushed these developments aside, stating that its "original decision did not turn on profitability alone. . . ."[80] Since the profitability of Western was the crucial reason for the original remand, we do not see how this fairly could be discarded without explication of why the change in this factor did not alter the conclusion.[81] The only factor identified in the Board's

April, 1971 order authorizing the remand of the competition question was profitability—"harm to Western under existing economic conditions. . . ."[82] The March, 1971 Supplemental Opinion and Order on Reconsideration had pointed to the related factor of "a difficult period . . . for Western in particular," but by May, 1974, Western's financial situation had brightened with earnings in excess of the 12% level found "reasonable" by the Board in its Domestic Passenger-Fare Investigation.[83]

The only remaining factor mentioned in the CAB's prior decision in this matter was the financial condition of the industry as a whole. But that consideration had been relied upon solely in terms of justifying a "more than usually careful" approach to evaluating the competition question in the San Diego-Denver market. That approach may have validity, if not carried to extremes, for it still leads up to an ultimate decision focused on the subject market. But we are unable to discern on what basis the Board can glean any support from this factor of general conditions once it has recognized, as it now apparently has, that the particular market will sustain competition and still be profitable. If an air transport market is substantial and thriving, we do not see how the fact that other markets are over-served, can justify leaving this market under-served, or depriving it of the public-interest benefits of competition.

Is the Board obliquely saying that monopoly profits are needed in this market to sustain overall industry earnings when shaky?

---

76. *See* Brief for Petitioner at 16–18, 47–49.

77. *See* Order 74–5–17, May 3, 1974, at 3, 10, 13, JA 102, 109, 112.

78. Continental's petition for reconsideration pointed to Western's traffic data showing a 23.9% growth in the market during the first eleven months of 1972 over the same period in 1971. *See* Petition of Continental Air Lines, Inc. for Reconsideration of Order 72–12–29, January 29, 1973, Appendix 10, at 1, JA 329.

79. Order 74–5–17, May 3, 1974, at 3, 13, JA 102, 112.

80. *Id.* at 3, JA 102.

81. *See Greater Boston Television Corp. v. FCC, supra* note 75, at 394, 44 F.2d at 852.

82. Order 71–4–112, April 16, 1971, at 1, JA 79.

83. *See* Domestic Passenger-Fare Investigation, Order 71–4–58, April 9, 1971, at 2. Western's 1973 rate of return was 12.3% and its profit for the fiscal year ending March 31, 1974 was 14.1%. *See* Brief for Petitioner at 15.

This would not only raise serious questions of Congressional intent, and adequacy of articulation of reasoning, but present the question whether there is evidence to show that competition in this market will not maintain overall profits,[84] by enhancing efficiency, quality of service, and the size of this and connecting-beyond markets.[85] In the end we are left with the conviction that the Board's reference to general industry conditions is "local color" to gain an atmosphere of acceptability for the result, rather than a novel, independent ground of decision resting on substantial evidence.

We have not ignored the passage, in the Board's opinion denying reconsideration, which says that the industry's faltering in its effort to achieve recovery "fortifies our resolve to avoid making unnecessary awards of competitive authority on routes that are adequately served."[86] The structure of this sentence suggests that the general faltering of industry factor (which we have already discussed and found wanting) was taken in conjunction with, and as fortifying, a separate regulatory notion that competition is "unnecessary" when existing (monopoly) service is "adequate." Such a concept would not only constitute a fundamental change in doctrine that

requires a more direct address and reasoned analysis than this elliptical reference[87] but more important would conflict with the intent of Congress as we discern it.[88]

## B. The Fuel Shortage

 We come, finally, to the fuel shortage issue to which the Board referred in ultimately denying reconsideration. The onset of the oil embargo in late 1973 diminished the fuel supplies available for air transportation. The Board's May, 1974 opinion grasped the fuel problem as an independent reason for rejecting competitive service.[89] As the Justice Department brief remarks, since fuel shortages are a permanent fixture of American life, this is tantamount to writing § 102(d) out of the act.[90] Moreover, the Justice Department aptly comments that there is no support for the Board's alleged fear that certificating competitive service would increase fuel consumption at the expense of more "essential service elsewhere" to the "overall detriment of the public interest."[91] The crisis of late 1973 may have justified temporary orders to preserve the status quo pending analysis, but not an indefinite abdication by CAB.[92] We have recently noted in another context that the existence of an energy crisis

---

84. Under previous Board opinions, the important issue is not maintenance of existing profit levels, but the more fundamental concern that carriers derive some profit from the market. See Southern Tier Competitive Nonstop Investigation, Order 73–2–89, February 23, 1973, at 7–8 (The Board noted that, once applicants "can be expected with reasonable assurance to operate their proposals at a profit," "[t]he relative profitability of their various operations is therefore not nearly as important a decisional factor as the public benefits they can provide."). In the present case, the ALJ noted that the Board "traditionally does not look beyond the estimated operating profit or loss on a proposed operation" to consider rate of return. Supplemental Initial Decision, supra note 24, at 80 n. 140, JA 610 n. 140.

85. The Board in 1971 had viewed the prospect of new profitable operation by Continental in the instant and connecting beyond segments as a "significant" positive factor. See Order 71–3–135, March 23, 1971, at 4, JA 70.

86. Order 74–5–17, May 3, 1974, at 2, JA 101.

87. See Greater Boston Television Corp. v. FCC, supra note 75, at 394, 44 F.2d at 852; Northeast Airlines, Inc. v. CAB, 331 F.2d 579, 589 (1st Cir. 1964) (Aldrich, J., concurring).

88. We approve the initial construction of the Act adopted by the Board concerning the relevance of the monopolist's service to the need for competition. See text accompanying note 57 and note 57 supra.

89. See Order 74–5–17, May 3, 1974, at 1–2, 13, JA 100–01, 112; Brief for Respondent in No. 74–1664, Eastern Air Lines, Inc. v. CAB, at 24.

90. Brief for United States as Amicus Curiae at 31 n. 16.

91. Id. at 30; Dissent of Member Minetti on Order 74–5–17, May 3, 1974, at 4–5, JA 123–24.

92. See United States v. CAB, 167 U.S.App.D.C. 313, 323–25, 511 F.2d 1315, 1325–27.

does not excuse a regulatory agency's "failure to seek answers" pertinent to the exercise of its duties or its "abdication of its duty to 'indicate fully and carefully the methods by which, and the purposes for which, it has chosen to act.' "[93]

◼ The CAB contends that its reference to the Remanded Atlanta/Detroit/Cleveland/Cincinnati Investigation was sufficient since "there was no reason for the Board to repeat in this case what it had already said in a companion case issued on the same day."[94] However, in the companion case the Board found that the proposed competitive flights "would consume well over 10 million gallons of fuel annually." In addition, it noted that the markets under consideration there were experiencing load factors "only moderately if at all above the Board's rate-making standard of 55 percent."[95] Here, by contrast, additional fuel was not required to institute competition. At the time of the final order, Western was planning to run four and a half nonstop trips in the San Diego-Denver market. This exceeded the two round trip flights each which the carriers had proposed to institute in the remand proceedings.[96] Moreover, the monthly on board coach load factors on Western's San Diego-Denver flights were repeatedly well in excess of the 55% level during the 14 months ending with July, 1973.[97] In this context, the Board's bare reference to the fuel shortage rationale set forth in the Atlanta-Detroit case is not sufficient to constitute reasoned decisionmaking for the disparate conditions of the San Diego-Denver market.

◼ Section 102 sets forth six public interest factors to guide the CAB in the exercise of its statutory duties. We are cognizant that in reviewing agency orders "[t]he court's responsibility is not to supplant the [Board's] balance of these interests with one more nearly to its liking,"[98] but the state of the record establishes that the Board recited the public benefits to be derived from competition, and did not itself accord them any real weight in the balance, dismissing them, in effect, as overborne by considerations, of the health of the industry and the fuel situation, which lacked any support in substantial evidence. Accordingly, the challenged orders are set aside and the record is remanded for further proceedings.

## IV. Remand Proceedings

The agency proceedings eventuating in Continental's petition for review were commenced over 8½ years ago. Two complete evidentiary hearings have been conducted and the ALJ has issued two thorough initial decisions detailing the characteristics of the market, analyzing traffic forecasts, and comparing the strengths of carriers seeking certification. The record before us contains ample evidence of the need for competing nonstop service. We agree with Intervenor Western Air Lines that "[p]ublic policy dictates that the case be brought to an end."[99] We thus contemplate that the CAB will proceed expeditiously on remand with selection of a competing

93. See Public Service Comm'n v. FPC, 167 U.S.App.D.C. 100, 108, 511 F.2d 338, 346 (1975).

94. Brief for Respondent at 36.

95. Opinion 74–5–18, May 3, 1974, at 4 & n. 6, JA 129 & n. 6.

96. See Supplemental Initial Decision, supra note 24, at 28, 43 n. 9, JA 558, 573 n. 91.

97. See Order 74–5–17, May 3, 1974, at Appendix A, JA 115 (6 months with load factors in excess of 60% and 3 additional months with load factors in excess of 70%).

We express no opinion on the merits of the petition to review the companion case relied on by the CAB in the instant proceeding. That case is pending in this court, Eastern Air Lines, Inc. v. CAB, No. 74–1664 (D.C.Cir., filed June 28, 1974).

98. See Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

99. Brief for Intervenor Western Air Lines at 25.

nonstop carrier. To avoid any unnecessary delay, we note that if the Board should invoke the procedure of petitioning this court to modify its mandate to permit taking of additional evidence on the pendency of this appeal, it should set forth with particularity the matters involved and their relationship to the desirability and feasibility of implementing competition.

Turning finally to the question of carrier selection, we note that this issue has also been fully fleshed out in the previous hearings. The ALJ has twice selected Continental over the other carriers seeking nonstop authorization to compete with Western. The Board has repeatedly noted the substantial beyond market benefits offered by Continental and has spoken in terms of the advantages provided by Continental in addressing the related competition question. Nonetheless, as Intervenor United Air Lines, points out, the Board has not squarely examined the ALJ's findings on the carrier selection issue. On remand the CAB should review the record and render a supplemental order either adopting the ALJ's determination or setting forth its separate reasons for accepting or rejecting the ALJ's selection. In view of the comprehensive record before the agency and the public interest in a prompt determination, we trust that the Board will proceed with expedition in completing carrier selection.

The case is remanded for further proceedings in accordance with this opinion.

*So ordered.*